UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


| | | |
|---|---|---|
| C. MICHAEL KAMPS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIV. NO. SA-13-CA-929-OLG |
| | * | |
| BAYLOR UNIVERSITY, KENNETH | * | |
| WINSTON STARR, in his official | * | |
| capacity as President of Baylor | * | |
| University, ELIZABETH DAVIS, | * | |
| in her official capacity as | * | |
| Executive Vice President and | * | |
| Provost of Baylor University, | * | |
| DAVID SWENSON, in his official | * | |
| capacity as Chair of the | * | |
| Admissions Committee and Chair | * | |
| of the Scholarship Committee of | * | |
| Baylor Law School, and Members | * | |
| of those Committees, | * | |
| | * | |
| Defendants. | * | |


**MEMORANDUM AND RECOMMENDATION**

In this **_pro se_** lawsuit, Plaintiff C. Michael Kamps alleges a violation of the Age Discrimination Act of 1975 ("ADA"), 42 U.S.C. § 6101 _et seq._ and its implementing regulations, when he was denied admission to Baylor University Law School ("Baylor Law School") in Fall 2010 and Fall 2011. Named as defendants are Baylor University, its President, Kenneth Winston Starr, Executive Vice-President Elizabeth Davis, and David Swenson, Chairman of the Admissions and Scholarships Committees.

Kamps, who graduated from Texas A&M University in 1979, contends that he was subjected to discrimination because of his age when defendants considered his 1979 grade point average ("GPA") which was comparatively lower than the GPAs of more recent college graduates who benefitted from "grade inflation." Kamps also complains that he was qualified for, but failed to receive, the Joseph Milton Nance Presidential Scholarship ("Nance Scholarship"), which is awarded to a Baylor law student who graduated from Texas A&M, due to Baylor Law School's use of his 1979 Texas A&M GPA. Finally, Kamps states that he was subjected to retaliation when he was denied admission in Fall 2012 after he filed a formal complaint of age discrimination.

Defendants have filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket nos. 25, 31, 33). Kamps has responded. (Docket nos. 27, 29). Having considered the pleadings, the arguments, and the applicable law, the Court is of the opinion the motion to dismiss should be granted.

## **Background**

Kamps is, and has been at all times subsequent to his application for admission to Baylor Law School, over the age of 50. In 1979, he graduated from Texas A&M's Mays Business School with a GPA of 3.2. He ranked 316th out of 1523, within the top quarter of his class at Texas A&M in 1979. Kamps scored a 169 on the Law

2

School Admissions Test ("LSAT").  "For a variety of reasons, Plaintiff applied to Baylor's Law School, and only to Baylor's Law School, for admission in 2010 and 2011." **Complaint**, p. 9.

Kamps first applied to Baylor Law School on or about October 30, 2009 for the Fall 2010 class.  He asserts that Baylor Law School uses two primary quantitative indicators in its admissions process, the candidate's GPA and LSAT score.  Based on Baylor Law School's report to the American Bar Association, Baylor Law School's presumptive admit line for Fall 2010 was candidates with a GPA at or above 3.50 and an LSAT score at or above 165.  Based on that same report, the presumptive deny line for Fall 2010 was candidates with a GPA below 3.25 or an LSAT score below 160.  Kamps acknowledges that his GPA placed him in the presumptive deny category.

Kamps was notified by letter dated February 17, 2010 that he had been placed on the wait list for Fall 2010.  **Complaint**, exh. T. He was advised that, if he reactivated his application, he would be accepted for the Summer 2010 class or Spring 2011 class.  **Id.**  He did not do so.  Kamps requested that his application be re-activated for Fall 2011.  By letter dated March 3, 2011, he was again placed on the wait list.  **Id.**  Kamps was advised that, if he reactivated his application, he would be accepted for the Spring 2012 class. **Id.**  Again, he did not do so.  On March 9, 2011, Kamps filed a

formal complaint of age discrimination with Baylor Law School concerning. **Complaint**, exh. I.

Kamps alleges that substantial and pervasive grade inflation--"a rise in the average grade assigned to students; especially the assigning of grades higher than previously assigned for given levels of achievement"--has been the norm in virtually all U.S. undergraduate institutions even before his graduation from Texas A&M in 1979 and has continued unabated since. **Complaint**, p. 10.  He cites a study showing that Texas A&M's grades increased at a rate of 0.135 points per decade from 1985-2004. **Id.**, p. 11. Comparing his 1979 class ranking to a 2010 graduate of Texas A&M's Mays Business School, Kamps estimates that his GPA would be 3.6.  **Id.**[1]

Kamps states that "[g]rade inflation, by the operation of its defining characteristics, renders the UGPA, which masquerades as one uniform and facially neutral standard, actually a series of disparate standards when earned by members of different academic generations." **Complaint**, p. 13.  He contends that "but for the age related bias in Defendants' admissions process, Plaintiff would have been admitted as a regular, not waitlisted, decision." **Id.**, p. 12.

---

[1]In his response, Kamps states that contrary to defendants' motion to dismiss, he does not assert that defendants should adjust his GPA upward. Instead, he claims the unadjusted GPA is not available to defendants under the ADA, and defendants must devise a non-discriminatory method of assessing older candidates' academic performance.

4

Regarding the Nance Scholarship, which is awarded only to Texas A&M graduates entering the Baylor Law School, Kamps notes that Baylor previously employed the "Baylor Index" for purposes of determining eligibility.  The "Baylor Index" was computed by multiplying the applicant's GPA by 10 and adding that amount to the applicant's GPA.  According to Kamps, the minimum Index score for 2009 was 200, which he met by scoring 201 (3.2 times 10 = 32 + 169 = 201).  **Complaint**, exh. E.  He claims that he was the only candidate who would have met those qualifications for 2010; however, three much younger candidates from Texas A&M, with Baylor Index values of 199.6, 197.2 and 196.9, received offers of admission from Baylor Law School.

Kamps acknowledges that, no later than February 15, 2010, or at some prior time, the Baylor Law School's Scholarship Committee abandoned the Baylor Index in favor of separate qualifying standards for the GPA and LSAT score.  Thereafter, qualification for the Nance Scholarship required a GPA of 3.4 and an LSAT score of 162.  For 2011, Baylor Law School raised the minimum GPA to 3.6, then again to 3.7 for the 2012 Fall class, allegedly compounding the injury to older candidates.

Kamps contends that the new qualifications were "tailored specifically to accommodate the aforementioned younger candidates" and to "fatally injure Plaintiff's candidacy..." **Complaint**, pp. 18-19.  He states that applications for the Nance Scholarship were due

in Texas A&M's Office of Professional School Advising on March 4, 2010, with Texas A&M's recommendations for the scholarship due shortly thereafter. **Id.**, p. 19. Kamps asserts that the nominating committee at Texas A&M requested leave of one or more defendants to nominate Kamps for the Nance Scholarship, noting that he was "a favorite of the Committee," and finding his argument concerning the GPA bias "compelling." **Id.**, p. 20. According to Kamps, defendants denied the committee's request, but did allow the committee to name Kamps as an alternate. **Id.** He alleges that, without his knowledge, the Texas A&M committee continued to urge defendants to award a substantial part (8 quarters rather than 9) of the Nance Scholarship to Kamps, should he accept Baylor University Law School's offer of admission to the class commencing in Spring 2011. **Id.**

Kamps alleges that defendants subjected him to retaliation as regards admission to the Fall 2012 law school class. He states that he filed his administrative complaint against defendants with the U.S. Department of Education on October 27, 2011 and provided Baylor Law School's Office of General Counsel with a courtesy copy of the complaint. Subsequently, defendants admitted their law school class for Fall 2012. Kamps was not in it. He asserts that his application for admission was active at the time defendants admitted the class; yet, he was placed on the wait list for this class. He seeks injunctive and declaratory relief, as well as damages.

## Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the filing of a motion to dismiss a case for failure to state a claim upon which relief can be granted.  Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  To survive a Rule 12(b)(6) motion to dismiss, the factual allegations must be sufficient to state a claim to relief that is plausible on its face and to raise a right to relief above the speculative level.  ***Bell Atlantic Corp. v. Twombly***, 550 U.S. 544, 555, 570 (2007).  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  ***Ashcroft v. Iqbal***, 556 U.S. 662, 678 (2009).  While a complaint need not contain detailed factual allegations, it must include more than labels and conclusions or a formalistic recitation of the elements of a cause of action.  ***Twombly***, 550 U.S. at 555.  The mere possibility of misconduct is not sufficient.  ***Iqbal***, 556 U.S. at 679.

The Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.  ***Lindquist v. City of Pasadena, Tex.***, 525 F.3d 383, 386 (5th Cir. 2008).  However, the Court need not accept plaintiff's *legal* conclusions as true.  ***Iqbal***, 556 U.S. at 678.  Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, will not suffice. *Id.* In considering whether to dismiss, a judge must hold a *pro se* party's complaint to a "less stringent standard" than used when examining complaints filed by counsel. *Frazier v. Wells Fargo Bank, N.A.*, --- Fed.Appx. ----, 2013 WL 5513987, at *1 (5th Cir. 2013). Nonetheless, *pro se* litigants, like all other parties, "must abide by" the rules that govern the federal courts. *Id.*

### Analysis

### 1. Exhaustion of Administrative Remedies

Defendants contend that Kamps' claims regarding non-admission to the Baylor Law School in Fall 2010 and Fall 2011, as well as his complaints concerning non-eligibility for the Nance Scholarship, are precluded by his failure to exhaust administrative remedies. According to the ADA, no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance. **42 U.S.C. § 6102.** An interested person may bring an action to enjoin a violation of the ADA by any program or activity receiving Federal financial assistance. **42 U.S.C. § 6104(e)(1).** However, no action shall be brought if administrative remedies have not been exhausted. **42 U.S.C. § 6104(e)(2).** *See D.A. ex rel. Latasha A. v. Houston Independent School Dist.*, 629 F.3d 450, 455 (5th Cir. 2010).

8

Kamps applied for admission to the 2010 Fall law school entering class on October 30, 2009. The letter dated February 17, 2010 advised him that he had been denied admission and placed on the waiting list. By letter dated March 3, 2011, Kamps was placed on the wait list for Fall 2011. **Complaint**, exh. T. Kamps filed his initial complaint of discrimination with the Department of Education on October 27, 2011. **Id.**, exh. C.

To satisfy the exhaustion requirement, a person must file a complaint with Department of Education alleging discrimination prohibited by the ADA or by its supporting regulations "within 180 days from the date the complainant first had knowledge of the alleged discrimination." **34 C.F.R. § 110.31(a).** Defendants note that Kamps' October 27, 2011 complaint was filed with the Department of Education more than 180 days after being placed on the wait lists for both the Fall 2010 and Fall 2011 classes. Under the ADA, in order for a district court to have jurisdiction over a civil action filed by a plaintiff to enforce rights created by that statute, the plaintiff must have exhausted available administrative remedies. ***Parker v. Board of Supervisors University of Louisiana-Lafayette***, 270 Fed.Appx. 314, 317 (5th Cir. 2008)(***Parker I***). Defendants conclude that Kamps' failure to file a timely administrative complaint with the Department of Education deprives this Court of jurisdiction over Kamps' claims regarding admission to the Baylor

Law School in Fall 2010 and Fall 2011, as well as his failure to receive the Nance Scholarship.[2]

In his response, Kamps states that the Fifth Circuit Court of Appeals in *Parker v. Board of Sup'rs University of Louisiana-Lafayette*, 296 Fed.Appx. 414 (5th Cir. 2008)(*Parker II*) "backed away" from its ruling that exhaustion under the ADA is a jurisdictional requirement.  In fact, the Court of Appeals did hold that it was "not required to determine whether 42 U.S.C. § 6104(e)(1)-(2)'s required notice is a jurisdictional requirement or a prerequisite to suit." *Id.* at 418.  Kamps contends, citing a New York district court case that the ADA exhaustion requirement is akin to a statute of limitations, which is subject to waiver, estoppel, and equitable tolling.  *See Strujan v. Teachers College Columbia University*, 2010 WL 3466251, at *3 (S.D.N.Y. 2010).[3]

However, in *Williams v. Trevecca Nazarene College*, 162 F.3d 1162, 1998 WL 553029, at *2 (6th Cir. 1998), the Sixth Circuit Court of Appeals held that exhaustion in the ADA is a jurisdictional matter, because the ADA specifies that "no action shall be brought" unless administrative remedies have been exhausted.  **42 U.S.C. §**

---

[2]Defendants also argue that Kamps' claim of retaliation as to the Fall 2012 admission denial, Count Eight, is barred because Kamps has filed no charge or administrative complaint relative to the Fall 2012 class.  In his response, Kamps does not oppose dismissal of this claim in light of the fact he cannot exhaust his administrative remedies on that matter until this lawsuit is resolved. **Response**, docket no. 27, pp. 7-8.

[3]The cases on which the *Strujan* Court relied in reaching its conclusion did not involve the ADA.

6104(e)(2). Closer to home, in *D.A. v. Houston Independent School Dist.*, 716 F.Supp.2d 603, 620-21 (S.D.Tex. 2009), the District Court held, citing to *Parker I*, that for a district court to have jurisdiction over a civil action filed by a plaintiff to enforce rights created by the ADA, the plaintiff must have exhausted available administrative remedies.  On appeal, the Fifth Circuit Court of Appeals in *D.A.* found, without discussing whether exhaustion is a jurisdictional prerequisite, that the plaintiff's failure to exhaust administrative remedies required dismissal. *D.A.*, 629 F.3d at 455-56.  Thus, while the answer is anything but certain, it appears that exhaustion of administrative remedies under the ADA is a jurisdictional prerequisite.

However, for purposes of the discussion in this case, the Court will assume that the exhaustion requirement in the ADA, while mandatory, is more similar to a statute of limitations subject to waiver, estoppel, and equitable tolling.  While Kamps does not specify on which exception he relies, he argues that his efforts to complain of the actions of Baylor Law School indicate that he did file his complaint within the 180-day time limit of 34 C.F.R. § 110.31(a).

Kamps accepts February 17, 2010, the date of the letter notifying him that he had been placed on the wait list for Fall 2010, as the date he "first had knowledge of the alleged discrimination." **34 C.F.R. § 110.31(a)**.  He states he first

attempted to access the relevant grievance processes on February 28, 2010 by way of a letter to Texas A&M, Office of Professional and Graduate School Advising. **Complaint**, p. 8.  He also cites to April 2010 when Kamps met with Becky Beck-Chollett, the Assistant Dean for Admissions, to complain about the admissions' decision and the revised Nance Scholarship qualifications. **Id.** Kamps later complained to the Scholarship Committee after learning the Nance Scholarship qualifications changed again. **Id.**

On March 9, 2011, Kamps finally filed a formal complaint of discrimination with Baylor Law School concerning his failure to be admitted, and as regards changes in the Nance Scholarship qualifications. **Complaint**, exh. I.  In that complaint, Kamps indicated that he had "to the best of [his] knowledge, exhausted [his] remedies within the Law School, and [was] appealing to the University." **Id.**  Upon inquiry by Kamps, the Baylor's Office of General Counsel confirmed via email, on October 4, 2011, that all internal appeals processes had been completed. **Response**, docket no. 27, exh. B.

As Kamps notes, the applicable regulation provides that, for good cause shown, the Department of Education may extend the 180-day time limit. **34 C.F.R. § 110.31(a)**.  He then cites to the Office for Civil Rights ("OCR") "OCR Case Processing Manual," Article I § 107 which addresses whether a waiver should be granted.  It provides that:

If a complaint allegation is not filed in a timely manner, OCR will notify the complainant of the opportunity to request a waiver. The Office Director, or designee, may grant a waiver of the 180-day filing requirement for good cause shown, such as under any of the following circumstances:

> (d) The complainant filed, within the 180-day period, an internal grievance with a recipient of federal financial assistance, or a due process hearing, alleging the same discriminatory conduct that is the subject of the OCR complaint, and the complaint is filed no later than 60 days after the internal grievance is concluded.

Kamps also refers to "Questions and Answers on OCR's Complaint Process" where, to the question, "What if I am already pursuing my complaint within the . . . college . . . ?," the Department of Education replies, "Once the other complaint process is completed, you have 60 days to refile your complaint with OCR."

Finally, Kamps notes that the OCR's instructions on "How to File a Discrimination Complaint with the Office for Civil Rights," under Institution Grievance Procedures provides:

> Prior to filing a complaint with OCR against an institution, a potential complainant may want to find out about the institution's grievance process and use that process to have the complaint resolved. However, a complainant is not required by law to use the institutional grievance process before filing a complaint with OCR. If a complainant uses an institutional grievance process and also chooses to file the complaint with OCR, the complaint must be filed with OCR within 60 days after completion of the institutional grievance process.

Kamps asserts that he pursued a complaint within Baylor Law School and filed his complaint with the Department of Education on October 27, 2011 within 60 days after completion of the Baylor Law School grievance procedure.

Kamps' argument fails to account for the applicable language which accords the OCR, not the Court, the responsibility and discretion to award a waiver of the filing time limit.  Both 34 C.F.R. § 110.31(a) and Article I, § 107 of the "OCR Case Processing Manual" ("CPM") provide that *the Department of Education may*, for good cause shown, extend the 180-day time limit for filing a complaint of discrimination.   (emphasis added).   As Kamps acknowledges, on January 24, 2012, the OCR dismissed his complaint, pursuant to § 106 of OCR's Case Processing Manual, finding his admission and scholarship claims had not been filed within 180 days of the date Kamps first had knowledge of the alleged discrimination. **Response**, docket no. 27, exh. C.  Additionally, the OCR denied Kamps' request for a waiver of the timeliness requirement.  **Id.**

Upon Kamps' request for reconsideration, the OCR determined that his allegations regarding Fall 2011 were timely but his Fall 2010 claims were not.  **Response**, docket no. 27, exh. C.  The OCR noted that Kamps filed an internal grievance pursuant to the University's Civil Rights Policy on March 9, 2011.  **Id.**   The University President affirmed the decision of the Civil Rights Resolution Committee and the Provost for final determination under the grievance policy on September 26, 2011.  **Id.**  The OCR found, "[w]ith respect to the 2010 Scholarship Decision and 2010 Admission Decision, while you first had knowledge of the alleged acts of

discrimination in April and June/July 2011[4], respectively, you did not file your internal grievance until March 9, 2011, which is outside of the 180-day requirement for which a waiver may be granted pursuant to CPM Section 107." **Id.**  Thus, his request for a waiver as to his Fall 2010 allegations was denied.  **Id.**

Kamps argues that his exhaustion of the grievance procedure began as early as February 28, 2010, when he sent a letter to Texas A&M, Office of Professional and Graduate School Advising, or April 2010, when he met with Becky Beck-Chollett, the Assistant Dean for Admissions at Baylor Law School, to complain about the admissions' decision and the revised Nance Scholarship qualifications.  The OCR relied instead on the date, March 9, 2011, when Kamps filed a formal internal grievance pursuant the University's Civil Rights Policy.

Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules.  ***Woodford v. Ngo***, 548 U.S. 81, 90 (2006).  Kamps failed to properly initiate the formal grievance procedure at Baylor prior to March 2011.  His letter to Texas A&M and his conversation with Assistant Dean Beck-Chollett were inadequate to initiate Baylor's internal grievance procedure.

For discrimination claims under Title VII, strict adherence to the procedural requirements, such as the filing of an administrative

---

[4]The OCR inadvertently stated that the year was 2011, instead of the actual year, 2010, when Kamps first learned he had been denied admission and scholarship eligibility for Fall 2010.  Also, whether the Court uses February 2010 or the April and June/July 2010 dates reflected in the OCR's decision as the date Kamps first gained knowledge of potential discrimination, the result that his Fall 2010 claims are time-barred is the same.

complaint, is required.   *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002).   Here, the ADA provides that no action shall be brought if administrative remedies have not been exhausted.   **42 U.S.C. § 6104(e)(2)**.   In another context involving a statute with similar language, our Court of Appeals has determined that a strict approach to exhaustion must be applied.   *See Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003), *overruled by implication on other grounds by* **Jones v. Bock**, 549 U.S. 199, 213–14 (2007)(applying strict approach to exhaustion requirement of 42 U.S.C. § 1997e(a) which provides that "[n]o action shall be brought ... until such administrative remedies as are available are exhausted.").   Because the Department of Education, through the OCR, determined that Kamps' March 2011 complaint concerning admission to the Baylor Law School and eligibility for the Nance Scholarship for Fall 2010 was untimely, that claim is barred from consideration in this Court under the ADA.   Counts Two through Five of Kamps' complaint, which concern the Fall 2010, should be dismissed.

## 2. Failure to State A Claim

### a. Intentional discrimination

As for Kamps' remaining claim for the denial of admission and scholarship in Fall 2011, defendants argue, under **Twombly** and **Iqbal**, that Kamps has failed to state a claim upon which relief can be granted.   The ADA provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." **42 U.S.C. § 6102.** Defendants assert that Kamps' allegations of age discrimination are "absurd" and "outlandish" and, at best, conclusory and speculative with no factual basis.

In the absence of authority specifying the requirements of proof for an ADA claim, the Court shall look to a remarkably similar statute. Identical, except for the relevant protected characteristic, § 601 of Title VI of the Civil Rights Act of 1964, states that, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." **Title 42 U.S.C. § 2000d.** Section 601 prohibits only intentional discrimination. ***Alexander v. Sandoval***, 532 U.S. 275, 280-81 (2001). It is reasonable to conclude that a plaintiff seeking to establish a cause of action under the ADA must also allege and prove intentional discrimination.

In his complaint, Kamps states that "[g]rade inflation, by the operation of its defining characteristics, renders the UGPA, which masquerades as one uniform and facially neutral standard, actually a series of disparate standards when earned by members of different academic generations." **Complaint**, p. 13. He claims that defendants "knew, or should have known, the effect that grade inflation would

17

have when comparing UGPAs earned in different eras. **Id.**, p. 23.
Kamps alleges that defendants offered admission to scores of
candidates with inferior LSAT scores and documented academic
performance, while possessing knowledge of the inherent bias in the
disparate standards they used to disqualify plaintiff. **Id.**, p. 25.

As for the Nance Scholarship, Kamps asserts that by
discontinuing the Baylor Index and requiring a GPA of 3.4, then 3.6
for the 2011 Fall class, defendants intended to specifically tailor
qualifications to younger candidates and to "fatally injure
Plaintiff's candidacy..." **Complaint**, pp. 18-19. He contends that
"[p]rior to the earliest date of any record of this decision
[abandoning the Baylor Index), Defendants knew the credentials of
the applicant pool, knew that Plaintiff was the only qualified
applicant under the existing qualifying criteria and knew that there
were three other, much younger, potential applicants who, though not
qualifying under the existing and long-established terms, had been
offered admission to the Law School." **Id.**, p. 17.

By these claims, Kamps seeks to allege that defendants
intentionally discriminated against him by failing to account for
grade inflation and by changing the requirements of the Nance
Scholarship to accentuate the importance of an applicant's GPA.
These assertions fail to satisfy the **_Twombly_** and **_Iqbal_** pleading
requirements. To establish "facial plausibility" under **_Twombly_**,
Kamps must include sufficient pleaded factual content which will

allow the Court to draw the reasonable inference that defendants are liable for the misconduct alleged. ***Iqbal***, 556 U.S. at 678.

Taking Kamps' factual allegations as true, the Court assumes that grade inflation does exist. However, that assumption is not enough. He must allege facts supporting his assertion that defendants failed to accord weight to grade inflation with the intent to discriminate against older applicants, such as Kamps, who earned their GPAs years ago. His complaint contains no such facts. Kamps' bald conclusion that defendants intended to prevent him from being admitted to the Baylor Law School because of his age and specifically tailored the Nance Scholarship qualifications to disadvantage him, which is all that is before the Court now, is not sufficient. ***See Bowlby v. City of Aberdeen, Miss.***, 681 F.3d 215, 227 (5th Cir. 2012)(claim by white business owner that defendants have not closed any business of a black person or alleged failure to comply with laws and regulations even though such non-compliance with laws and regulations by black businesses exist, failed to allege intentional discrimination in violation of equal protection); ***Prewitt v. Continental Automotive***, 927 F.Supp.2d 435, 454 (W.D.Tex. 2013)(mere conclusory allegations of bias are not sufficient in the absence of factual allegations suggesting discriminatory intent). At this point, Kamps alleged only the mere possibility of misconduct which will not suffice. ***Iqbal***, 556 U.S. at 679.

19

Additionally, as defendants note, Kamps' allegations of intentional discrimination as to the Nance Scholarship are refuted by the timing of events. He states that one or more defendants changed the qualifying criteria for the Nance Scholarship with full knowledge of the fact that the change would disqualify plaintiff and suddenly qualify three previously unqualified candidates. **Complaint**, p. 25. However, according to the statement of defendant David Swenson dated June 10, 2011 to the Civil Rights Issues Resolution Committee, the decision to move away from the Baylor Index was made in Spring 2009 or early Fall 2009, before Kamps even applied for admission to the Baylor Law School and for the Nance Scholarship. **Complaint**, exh. J, ¶¶ 15, 17.[5] That decision also occurred before the deadline for other candidates to apply for the Nance Scholarship.

While the new criteria were not sent to Texas A&M until early February 2010, the timing of the decision to change the requirements precludes the possibility the change was made to disqualify Kamps. Also, the decision was based upon the recommendations of a Law School strategic planning committee. **Complaint**, exh. J, ¶ 15. Kamps provides no facts to suggest that this committee was motivated by age discrimination in making its recommendations.

---

[5]Without providing alternative dates, Kamps disputes the truth of Swenson's declaration. However, at this stage, documents attached to the complaint may be considered. ***Kennedy v. Chase Manhattan Bank USA, NA***, 369 F.3d 833, 839 (5th Cir. 2004).

### b. Disparate treatment

In arguing that he has been subjected to age discrimination because defendants considered his unadjusted 1979 GPA, his complaint, at best, suggests that defendants' policy has a disparate impact on older applicants.  In fact, in his complaint, Kamps alleges that the GPA "masquerades as one uniform and facially neutral standard..."  **Complaint**, p. 13.  He further states that:

> "Defendant(s), through its, his, her or their use of the UGPA when the candidate pool, as in this case, comprises applicants of substantially dissimilar ages, take(s) actions that *have the effect*, on the basis of age, of (1) excluding individuals from, denying them the benefits of, or subjecting them to discrimination under a program or activity receiving Federal financial assistance and/or (2) denying or limiting individuals in their opportunity to participate in any program or activity receiving Federal financial assistance. (emphasis added).

**Complaint**, p. 14.  However, Kamps cannot state a claim for disparate impact under the ADA.

In ***Alexander v. Sandoval***, 532 U.S. 275 (2001), the Supreme Court addressed § 602 of Title VI of the Civil Rights Act of 1964, which authorizes federal agencies "to effectuate the provisions of [§ 601] ... by issuing rules, regulations, or orders of general applicability."  **42 U.S.C. § 2000d–1.**  One of those regulations forbids funding recipients to "utilize criteria or methods of administration which *have the effect* of subjecting individuals to discrimination because of their race, color, or national origin ...."  **28 C.F.R. § 42.104(b)(2)** (emphasis added).  While concluding

21

that regulations proscribing activities that have a disparate impact on the basis of race, color, or national origin are valid, the Supreme Court held that no freestanding private right of action to enforce regulations promulgated under § 602 exists. **Alexander**, 532 U.S. at 281-82, 293.  In reaching this conclusion, the Supreme Court noted that the language in § 602 that "[e]ach Federal department and agency ... is authorized and directed to effectuate the provisions of [§ 601]," demonstrates no congressional intent to create new rights, but rather an intent to limit agencies to effectuating rights already created by § 601.  **Id.**, at 288-89.

Similar to § 602 of Title VI of the Civil Rights Act of 1964, the ADA directs the Secretary of Health and Human Services and the "head of each Federal department or agency which extends Federal financial assistance to any program or activity" to promulgate regulations "to carry out the provisions of section 6102." **42 U.S.C. § 6103(a)(1)-(4)**.  One of those regulations, 34 C.F.R. § 110.10(b), states that a recipient may not, in any program or activity receiving Federal financial assistance ... use age distinctions or take any other actions that *have the effect*, on the basis of age, of ... (1) Excluding individuals from, denying them the benefits of, or subjecting them to discrimination under a program or activity receiving Federal financial assistance; or (2) Denying or limiting individuals in their opportunity to participate in any program or activity receiving Federal financial assistance."

22

(emphasis added).  Kamps cites to § 110.10, in his response to the motion to dismiss, as a provision defendants have violated. **Response**, docket no. 29, pp. 11-12.

Section 110.10 arguably precludes any rule, policy or procedure in a program or activity receiving Federal financial assistance which has a disparate impact on persons because of their age. However, as with the regulations supporting §§ 601 and 602 of Title VI of the Civil Rights Act of 1964, § 110.10 is simply a means of implementing 42 U.S.C. § 6103 and enforcing 42 U.S.C. § 6102.  ***See Alexander***, 532 U.S. at 288-89.  Thus, as in the case of discrimination in any program or activity receiving Federal financial assistance based upon race, color or national origin, it does not appear that a private cause of action exists under the ADA regulations for discrimination when a rule, policy or procedure implemented by a recipient of Federal financial assistance has a disparate impact on persons because of their age.  Kamps is left with a claim for intentional discrimination which he has not adequately alleged.

### c. Exception to liability

Related to the absence of a cause of action for disparate impact is a statutory exception to liability under § 6102.  Title 42 U.S.C. § 6103(b)(1)(B) provides that it shall not be unlawful for any person to take any action otherwise prohibited by § 6102 if, in the program or activity involved, the differentiation made by such

action is based upon reasonable factors other than age.  Here, the use of Kamps' GPA is a reasonable factor other than age.

As defendants note, 34 C.F.R. § 110.13 specifically states that a recipient is permitted to take an action otherwise prohibited by § 110.10 that is based on a factor other than age, *even though that action may have a disproportionate effect on persons of different ages*.  (emphasis added).  An action may be based on a factor other than age only if the factor bears a direct and substantial relationship to the normal operation of the program or activity or to the achievement of a statutory objective.  **34 C.F.R. § 110.13**. Unarguably, the college GPA of an applicant for admission to law school bears a direct and substantial relationship to the admission decision.  In fact, it is perhaps the most universal consideration nationwide.  Even if Kamps and other older applicants are adversely impacted by grade inflation, the failure to disregard his GPA does not violate the ADA.

### d. Alternatives

Kamps contends that, rather than use his college GPA, defendants should have considered his class rank.  According to his complaint, Kamps ranked 316 out of 1523 graduates.  **Complaint**, exh. F.  He also asserts that studies consistently show that a combination of the LSAT and GPA (such as the Baylor Index) provides a better prediction than either the LSAT or UGPA alone.  Kamps

further contends that the LSAT alone is a better predictor than the GPA alone.

While proof of available alternative practices is relevant in a disparate impact case, **see *Ricci v. DeStefano***, 557 U.S. 557, 578 (2009), the ADA, for the reasons discussed above, does not create liability based upon the mere effect of a policy.  Kamps must allege and prove intentional discrimination.  Whether defendants could have utilized a different admissions practice, no matter how reasonable, does not establish intentional discrimination based upon age. Counts One, Six, Seven and Nine of Kamps' complaint should be dismissed.

### e. Exclusion from Baylor Law School

Perhaps the most obvious reason that Kamps has failed to state a claim is the fact that he was not denied admission to Baylor Law School.  He was only denied admission for Fall 2011 and was offered admission to classes entering in the Spring and Summer.  In fact, Kamps could have started Baylor Law School in the Summer semester of 2010 and been finished by now.  Alternatively, he was offered admission for Spring 2011 and Spring 2012.  Kamps acknowledges that, had he accepted the offer to go to Baylor Law School in Spring 2011, he may have been awarded a substantial part (8 quarters rather than 9) of the Nance Scholarship.  **Complaint**, p. 20.  He chose not to accept those admission offers either.

In his response, Kamps argues that simply allowing his participation in one class but not another, on the basis of a biased standard, is discrimination on its face. **Response**, docket no. 29, p. 13.  He claims entitlement to enter the Fall classes which are more competitive. **Complaint**, p. 23.  Citing ***Brown v. Board of Education***, 347 U.S. 483 (1954), ***Sweatt v. Painter***, 339 U.S. 629 (1950), and ***McLaurin v. Oklahoma State Regents,*** 339 U.S. 637 (1950), Kamps states that inherent inequality has been found due to "specific benefits enjoyed," "those qualities which are incapable of objective measurement," "intangible considerations," or "feelings of inferiority" due to "separate but equal" arrangements.

In ***Sweatt***, the Supreme Court held that, under the Equal Protection Clause of Fourteenth Amendment, a qualified Black applicant had a personal and present right to a legal education equivalent to that offered by the State to students of other races. In ***McLaurin,*** the Supreme Court held that the plaintiff was entitled to the same treatment at the hands of the State as students of other races and that assignment of plaintiff to a seat in classroom in a row specified for colored students, assignment to a table in library, and assignment to a special table in cafeteria, deprived plaintiff of his personal and present right to equal protection of the laws.  In ***Brown***, the Supreme Court held that segregation of children in public schools solely on the basis of race, even though the physical facilities and other tangible factors may be equal,

26

deprives the children of the minority group of equal educational opportunities, in contravention of the Equal Protection Clause of the Fourteenth Amendment.  Each of these cases involved the Equal Protection Clause, a legal principle not before the Court in the case at bar.[6]

For multiple reasons, many would find Kamps' comparison, between starting law school in the Spring or Summer as opposed to the Fall and the educational conditions imposed upon Blacks as late as the 1940s and 1950s, to be offensive.  Race and age are not equally protectable characteristics.  Any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and subject to strict scrutiny.  ***Fisher v. University of Texas at Austin***, 133 S.Ct. 2411, 2419 (2013).  Classifications based upon age need only satisfy the rational basis standard.  ***Massachusetts Bd. of Retirement v. Murgia***, 427 U.S. 307, 313 (1976).  "While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their

---

[6]In response to defendants' arguments concerning a cause of action under the Equal Protection Clause, Kamps denies that he has presented any constitutional claim. **Response**, docket no. 29, p. 13.

27

abilities." *Id*.   Kamps' "separate but equal" analysis has no foundation.

Considering ***Brown*** for the moment, the Supreme Court found that racially separate public educational facilities are inherently unequal.  ***Brown***, 347 U.S. at 495.  Kamps is not being offered acceptance into a segregated Baylor Law School facility for older applicants.  He was entering the same law school as every other applicant, young and old, simply at a different time of the year when more spaces were available.  Kamps would attend the same classes, taught by the same professors as every other student and obtain the same legal education and decree.  His decisions, made on multiple occasions, to decline Baylor Law School's offers for admission were his own.  Kamps cannot now attempt to blame defendants for his ill-advised choices.

Finally, returning to the central issue of whether defendants intentionally discriminated against Kamps because of his age, the Court is unable to fathom how a jury could find that defendants discriminated against him because of his age in the Fall but not in the Spring or Summer.  Kamps possesses no more right to pick and choose when he enters law school than a new employee has to decide when he would like to begin his employment.  By declining admission to the Baylor Law School, Kamps voluntarily chose to forego any possibility that he could receive the Nance Scholarship, which is offered only to Baylor Law School students.  He has failed to state

28

a claim upon which relief can be granted under the ADA and its accompanying regulations.

## Recommendation

It is, therefore, the recommendation of the Magistrate Judge that defendants' motion to dismiss be **GRANTED**.

## Instructions for Service and Notice of Right to Object

The District Clerk shall serve a copy of this Memorandum and Recommendation on all parties either electronically or by mailing a copy by certified mail, return receipt requested.  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), Fed.R.Civ.P., any party who desires to object to this Memorandum and Recommendation must serve and file specific written objections within 14 days after being served with a copy. *Such party shall file the objections with the District Clerk and serve the objections on all other parties and the Magistrate Judge.*  A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days after being served with a copy shall bar that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of factual findings and legal conclusions to which the party did not object, which were accepted and adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150

(1985); *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

**SIGNED** October 30, 2013.

_____
JOHN W. PRIMOMO
UNITED STATES MAGISTRATE JUDGE